**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VIRGINIA Y.,**[1] | ) | |
| | ) | **No. 17 CV 4070** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | **November 14, 2018** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Virginia Y. ("Virginia") brings this action challenging the Commissioner of the Social Security Administration's final decision denying Virginia's applications for Supplemental Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI"). Virginia claims that she is disabled because of coronary artery disease ("CAD"), remote history of congestive heart failure ("CHF"), obesity, hypertension, asthma, and osteoarthritis, among other impairments. Before the court are the parties' cross-motions for summary judgment. For the following reasons, Virginia's motion is denied and the government's is granted:

### Procedural History

Virginia filed her application for SSDI and for SSI in September 2014, claiming a disability onset date of January 10, 2011. (Administrative Record ("A.R.") 13, 142.)

---

[1] In accordance with the recent recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, this court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

After her claim was denied initially and upon reconsideration, (id. at 96-104, 134-37), Virginia sought and received a hearing before an administrative law judge ("ALJ"), which took place on August 3, 2016, (id. at 38-89). Virginia was represented by counsel at the hearing. (Id. at 13, 41.) On December 14, 2016, the ALJ issued a decision concluding that Virginia is not disabled and therefore not entitled to SSDI or SSI. (Id. at 10-37.) When the Appeals Council denied Virginia's request for review, (id. at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Virginia filed this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g); (R. 1), and the parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 5).

## Background

With an undergraduate degree in child development and a master's degree in early childhood, (A.R. 45), Virginia worked in childcare services from 1978 through the end of 2010, serving as a teacher, coordinator, consultant, and program director, (id. at 247). Virginia worked as an early childhood services program director for the State of Illinois from 2007 to 2010, supervising Illinois's daycare licensing program. (Id. at 47-49, 53-54, 77, 247-48.) From 2003 to 2007, Virginia served as a consultant for the Philadelphia school system, developing early childhood programs and curriculum. (Id. at 76, 247, 249.) Virginia asserts that beginning in January 2011, at the age of 62, her health declined drastically and prevented her from working.

(R. 18, Pl.'s Mem. at 2.)  During the administrative hearing in August 2016, Virginia presented medical and testimonial evidence in support of her disability claim.

## A.    Medical Evidence

Virginia has a history of cardiac problems, asthma, osteoarthritis, hypertension, renal failure, hip and knee pain, obesity, and other impairments. (A.R. 46-51, 55-60, 65-67.)  In 2009 she suffered a heart attack and underwent bypass surgery.  (Id. at 47, 50.)  She returned to work thereafter but approximately 70 percent of her job required travel, but she was no longer able to travel.  (Id. at 18, 48-49.)  She took unemployment in 2010 and consulted for a few months in 2011 before stopping because of dizziness, fatigue, and a respiratory infection.  (Id. at 18, 50-51.) Virginia continued to experience shortness of breath and chest pains.  (Id. at 350.)

As of May 2011, Virginia was "doing well from a cardiac standpoint."  (Id. at 827, 829; see also id. at 821 (noting that "the heart is not enlarged" but "aorta is tortuous").)  Echocardiogram ("ECG") testing in July 2011 showed normal size and systolic function in Virginia's left ventricle, no regional wall motion abnormalities, and mild concentric hypertrophy.  (Id. at 388.)  Doppler parameters "were consistent with abnormal left ventricular relaxation (grade 1 diastolic dysfunction)."  (Id.)  At the same time, Virginia reported walking about two miles a day and swimming about 10 laps without "any significant distress."  (Id. at 420.)  During a December 2011 follow-up visit, Virginia denied shortness of breath or chest pain and her CAD was "doing well."  (Id. at 336; see also id. at 339-40 (reporting same on August 3, 2012).)

On August 7, 2012, Virginia presented at the hospital with chest pain and shortness of breath. (Id. at 410, 412.) An ECG showed nonspecific ST- and T-wave abnormality. (Id. at 380.) In February 2013 a doctor noted Virginia's diagnosis as coronary atherosclerosis of the native coronary artery and described her course as "[w]ell controlled." (Id. at 345; see also id. at 18 (noting shortness of breath since 2007), 470 (reporting CHF diagnosis in 2000), 825-26 (noting coronary atherosclerosis since April 2007 and left heart failure since August 2005).)

Virginia returned to the hospital in February 2014 with complaints of dyspnea, chest discomfort, and jaw and left arm pain. (Id. at 546, 691, 841.) She had not visited a cardiologist for two years because of her lack of insurance. (Id. at 23, 961.) An ECG showed "[l]eft ventricular enlargement with normal function" and "[l]eft atrial enlargement." (Id. at 553.) It also revealed "[s]inus bradycardia" and "nonspecific T wave abnormality." (Id.) Virginia had a class I rating on the Canadian Cardiovascular Society's ("CCS") grading scale, which involves "[a]ngina with strenuous or rapid or prolonged exertion at work or recreation." (Id. at 23, 844.) During a March 2014 visit to a family health center, Virginia denied shortness of breath and her CAD "looked good." (Id. at 956.)

In August 2014 Virginia's treating cardiologist, Dr. Lowell Steen, reported that Virginia had "unstable angina" and was a CCS III, meaning that "[a]ngina is likely triggered by walking one or two blocks on the level and climbing one flight of stairs at normal condition and pace." (R. 18, Pl.'s Mem. at 3-4 n.2.) Dr. Steen performed a left-heart catheterization procedure and found that Virginia's "[g]lobal left

ventricular function was normal." (A.R. 684-86.) In October 2014 Virginia complained of jaw pain while walking and climbing stairs. (Id. at 24, 858.) Dr. Ronald Schreiber determined that Virginia likely suffered from exercise-induced angina, which was stable, and assigned her a CCS II rating, meaning angina may occur by such activities as "[w]alking or climbing stairs rapidly [and] walking uphill." (Id. at 24, 861.) A catheter procedure confirmed that Virginia had stable CAD. (Id. at 24, 675, 872.)

A December 2014 ECG showed normal left global ventricular ejection fraction, left atrial enlargement, and mild left ventricular hypertrophy. (Id. at 24, 982-85.) Virginia again reported shortness of breath and fatigue but no chest pain in January 2015. (Id. at 24, 973; see also id. at 1077-78 (noting in August 2015 that Virginia was "cleared" by cardiology and had no new CAD issues).) Virginia presented at the emergency room in June 2016 because of shortness of breath and jaw pain. (Id. at 1318, 1330, 1343.) An ECG showed "normal global left ventricular ejection fraction, mild mitral regurgitation and mild left atrial enlargement." (Id. at 28; see also id. at 1339-40.) Virginia had "no problem with adult daily living activities." (Id. at 1345.) In July 2016 Dr. Steen classified Virginia as CCS I with "stable" CAD. (Id. at 28, 1314-15.)

Shortly after the August 3, 2016 hearing, Virginia experienced angina, dizziness, and jaw pain and underwent another catheterization. (Id. at 28-29, 1304.) The procedure showed "severe 3-vessel" CAD, (id. at 29, 1298), and Virginia was classified as CCS III, (id. at 1293). In September 2016 Virginia had an ischemic

stroke secondary to cerebrovascular disease. (Id. at 1584.) CT and MRI scans of the head showed "an appearance consistent with moderate chronic small vessel ischemic disease." (Id. at 1602, 1607.) Virginia underwent cardiac bypass surgery on September 19, 2016. (Id. at 1455-56.) During her post-operative hospital stay, Virginia suffered a kidney injury, which improved over the next 24 hours. (Id. at 1455.) On October 12, 2016, Dr. Steen reclassified Virginia as CCS I, found her CAD to be "stable," and referred her to cardiac rehabilitation. (Id. at 1421.)

Virginia has also suffered from asthma since childhood. (Id. at 422, 444, 510.) In February 2010 pulmonary testing showed that Virginia had a "mild to moderate restrictive defect with a moderate defect in gas diffusion," possibly with a "superimposed obstructive defect." (Id. at 593, 711.) Before 2011 Virginia had not visited the hospital because of asthma for two years. (Id. at 429, 1165.) In July 2011 Virginia presented at the hospital reporting shortness of breath without relief from albuterol. (Id. at 417-20 (observing that Virginia had a "significant bilateral wheeze" without "acute distress" or an inability "to speak in complete sentences")). ) Virginia had not taken her medications because of "insurance coverage issues" and "financial reasons." (Id. at 417, 420, 422.) Her condition improved with nebulizer treatments. (Id. at 429.) Virginia experienced asthma exacerbations again in December 2011, which again improved with "nebulization and prednisone." (Id. at 441.)

In December 2012 Virginia visited an asthma outpatient clinic and "[h]er course was described as moderate with two admissions in the past year." (Id. at 22.) In April 2014 Virginia's asthma was under control. (Id. at 24-25, 944-47 (noting

"normotensive and normal lung findings" with "no rales, rhonchi, or wheezes"), 1006 (noting "asthma stable" and no albuterol required).) May 2016 testing showed that Virginia's asthma "may not be well controlled," (id. at 1051), but she reported no emergency room visits or hospitalizations because of asthma and her risk was "low," (id. at 1052; see also id. at 988, 997, 1001, 1015, 1019).

Additionally, Virginia has experienced knee and hip pain. In March 2014 Virginia complained of pain in her left knee, despite "never [having] had knee pain before." (Id. at 954-55.) She obtained minimal relief with "hot pads and [T]ylenol." (Id.) An x-ray revealed "[m]ild degenerative arthritic changes of the left knee" without any acute findings. (Id. at 965.) Virginia was diagnosed with osteoarthritis of the knee in November 2014. (Id. at 825, 965; see id. at 1021 (noting that x-rays showed "mild" osteoarthritis).) In December 2014 Virginia experienced left knee pain that was exacerbated by prolonged standing. (Id. at 919-20.) She reported having tried "[T]ylenol, heat, ice, [and] ointments with varying amounts of relief." (Id. at 920.) No swelling was apparent, and Virginia's knee had not given out or locked. (Id.) Virginia was diagnosed with degenerative joint disease. (Id. at 922.)

In early 2015 Virginia was evaluated for a left medial meniscus tear. (Id. at 1008; see also id. at 1017 (noting that a January 2015 MRI showed an "[o]blique tear posterior horn medial meniscus").) She received cortisone injections but felt no relief. (Id. at 973, 1020; see also id. at 1106, 1251, 1264.) She reported "[m]ild improvement" with a knee brace and attended physical therapy sessions. (Id. at 25, 966-68, 1020.) In June 2015 Virginia twisted her left knee when getting out of bed and fell, injuring

her left hip and knee. (Id. at 1265.) X-rays showed "[n]o acute fracture or dislocation," but there were "significant degenerative changes involving the left hip joint." (Id. at 1274-82.) Virginia was prescribed anti-inflammatory medicine and Tylenol, along with physical therapy. (Id. at 1264.) A few weeks later, Virginia fell, injuring her left forearm, knee, and ankle. (Id. at 1142-48.) X-rays showed degenerative changes but no fractures. (Id. at 26, 1150-55.) Virginia received physical therapy and by August 2015, her hip was "much better." (Id. at 27, 1217, 1225-44; but see id. at 1156 (receiving hip injection in March 2016), 1251 (complaining of hip pain in December 2015).)

Finally, Virginia has suffered from hypertension and obesity since at least 2005. (Id. at 826, 986.) Virginia's hypertension has been well-controlled, (id. at 543, 844, 947, 1079, 1421), and she has tried to lose weight, (id. at 24-27, 444, 1127).

## B.     Virginia's Hearing Testimony

Virginia described her symptoms and medical treatment at her August 2016 hearing. Virginia testified that she became disabled on January 10, 2011, when her health began to decline rapidly. (A.R. 50-51.) She experienced shortness of breath beginning in 2007. (Id. at 55-56, 69-70.) She had angina pain at times every other day, two to three times a day. (Id. at 65.) She elevated her legs because of swelling for two to three hours, at least two to three times a week. (Id. at 71-72.) Her medications caused drowsiness, requiring her to nap two to four times daily. (Id. at 72.) Virginia underwent cardiac rehabilitation and physical therapy. (Id. at 56-57, 59.) She also had three asthma inhalers and an "asthma machine" and took an

asthma pill twice daily to control her asthma.  (Id. at 66-67.)  She received injections in her knee and hip and took Tramadol and Tylenol for pain, without relief.  (Id. at 60-61.)  She developed renal failure, causing frequent urination.  (Id. at 67, 75.)

Virginia's family hired a care worker in 2012 to assist her with daily activities two days a week.  (Id. at 57, 73.)  When the care worker was not with her, Virginia stayed in bed.  (Id. at 67.)  She used a portable toilet in her bedroom.  (Id.)  Virginia's daughter prepared meals for her.  (Id. at 68.)  About a month before the hearing, Virginia arranged for a nurse to come to her home every other day to take her vitals and for a physical therapist to assist her with exercises.  (Id. at 62-64.)

Regarding work history, Virginia testified that the information she provided to the SSA was not correct insofar as she had indicated that her program director job for the State of Illinois primarily was a seated job.  (Id. at 78, 250.)  Virginia testified that generally she was on her feet all but an hour or two of the work day when traveling to or from a daycare licensing meeting.  (Id. at 18, 55.)

## C.    Vocational Expert's Hearing Testimony

The ALJ also heard the testimony of a vocational expert ("VE") about jobs available to someone with Virginia's limitations.   Based on the Dictionary of Occupational Titles ("DOT"), the VE determined that Virginia's past relevant work as an educational program director would be classified as sedentary but light as performed and her work as an education consultant would be classified as sedentary. (Id. at 82-83.)  Both jobs were deemed to be highly skilled and involved supervision, administration, and research, and the skills not transferable.  (Id.)

The ALJ asked the VE hypothetical questions regarding an individual with the same age, education, and work experience as Virginia. The ALJ asked about the jobs the individual could perform if she had the following residual functional capacity ("RFC"): occasionally lift 20 pounds and frequently lift 10 pounds; carry, push, and pull the same; sit, stand, and walk for six hours; frequently climb ramps and stairs and occasionally climb ladders, ropes, or scaffolds; and never be around unprotected heights or moving mechanical parts. (Id. at 83-84.) The ALJ specified that this individual should avoid concentrated exposure to pulmonary irritants and extreme cold and heat. (Id. at 84.) The VE opined that such person could perform Virginia's past relevant work. (Id.) When the ALJ asked about the jobs the same individual could perform if she were also limited to occasionally climbing ramps and stairs, stooping, kneeling, and crouching, the VE responded that this individual could still perform Virginia's past relevant work. (Id. at 85-86.)

The ALJ then asked about the jobs an individual with the same age, education, and work experience as Virginia if she had the following RFC: limited to sedentary work where the person could lift 10 pounds, frequently less; carry the same; and stand for two hours and walk for two hours. (Id. at 85.) The VE responded that this individual could perform work as an educational director to the limits described in the DOT and as an education consultant per the DOT as actually performed. (Id.) Under additional hypothetical questions that added the following factors, the VE testified that past relevant work would be precluded: (1) off task more than 15 percent of the day; (2) absent two or more days per month; (3) on her feet less than one hour

and sitting less than four hours a day, occasionally reaching, and elevating her feet two to three times a day for one to two hours; (4) only occasionally using her left hand; and (5) requiring unscheduled breaks to doze due to medication effects. (Id. at 85-86.)

## D.    The ALJ's Decision

On December 14, 2016, the ALJ issued a decision denying Virginia's disability claims. (A.R. 13-31.) The ALJ followed the standard five-step sequence in analyzing Virginia's claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). After determining that Virginia met the insured status requirements through June 30, 2016, the ALJ found at step one that Virginia had not engaged in substantial gainful activity after her disability onset date. (A.R. 16.) At step two the ALJ deemed the following impairments severe: CAD with remote history of myocardial infarction, stent placement, and bypass; remote history of CHF; obesity; hypertension; asthma; and as of July 2015, osteoarthritis of the left hip and knee. (Id.) At step three the ALJ determined that Virginia did not have an impairment or combination of impairments that met the severity of a listed impairment. (Id.) Before turning to step four, the ALJ determined that Virginia had the RFC to perform light work with additional limitations from her alleged onset date through January 31, 2014, and then sedentary work with the same limitations after February 1, 2014. (Id. at 17-30.) Based on that RFC, the ALJ determined at step four that Virginia could perform her past relevant work. (Id. at 30.) The ALJ thus concluded that Virginia is not disabled. (Id. at 31.)

**Analysis**

Virginia argues that the ALJ erred by: (1) determining that her sleep apnea and meniscus tear were not severe impairments at step two; (2) failing to support the RFC determination with substantial evidence, including by misapplying the treating physician rule, cherry picking, and playing doctor; (3) improperly evaluating her symptoms; and (4) finding that she could perform past relevant work. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation and citation omitted). This court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or omissions," reversal may be required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

**A.      Step-Two Analysis**

Virginia argues that the ALJ erred when he deemed her sleep apnea and meniscus tear non-severe. As the claimant Virginia bears the burden of proving severity at step two. *See Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). "A severe impairment is an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities.'" *Id.* (quoting 20 C.F.R. § 404.1520(c)); *see also* SSR 96-3P, 1996 WL 374181 (July 2, 1996). When determining severity, courts may consider "whether the claimant received a

'definite diagnosis,' whether treatment was recommended, and whether medication remedied or controlled the impairment." *Colson v. Colvin*, 120 F. Supp. 3d 778, 788 (N.D. Ill. 2015) (internal quotation omitted).

Reviewing the medical records and Virginia's hearing testimony, the court finds that there is substantial evidence to support the ALJ's non-severity finding as to sleep apnea. *See Minnick*, 775 F.3d at 935. The record refers generally to a previous diagnosis of obstructive sleep apnea, (A.R. 530, 579, 1162, 1253), but lacks any objective evidence that the condition limits Virginia's ability to work in any way, let alone significantly, *see* 20 C.F.R. § 404.1520(c); *see also Colson*, 120 F. Supp. 3d at 788. Virginia fails to point to any evidence indicating when she was diagnosed with sleep apnea, the basis for the diagnosis, treatment for the condition, or whether it was remedied. (See R. 18, Pl.'s Mem. at 14-15.) Nor did Virginia complain about sleep apnea during the hearing.[2] (A.R. 16); *see also Schloesser v. Berryhill*, 870 F.3d 712, 718-19 (7th Cir. 2017) (finding that minimal complaints and treatment support a non-severity finding).

Likewise, the ALJ's non-severity finding as to Virginia's torn meniscus does not amount to a reversible error. The record includes an MRI showing a torn meniscus. (A.R. 1017, 1035-36, 1100.) The ALJ determined that "objective

---

[2] Virginia contends that her testimony that she needed to sleep two to four times per day was sufficient to prove the severity of her sleep apnea. (R. 27, Pl.'s Reply at 2.) But she testified that her drowsiness increased when she took medication. (A.R. 72.) Furthermore, when posing hypothetical questions to the VE during the hearing, Virginia's counsel tied her need for unscheduled breaks to "dozing off from medication." (Id. at 86.) Neither Virginia nor her counsel referred to sleep apnea.

documentation concerning this impairment is not of record." (Id. at 16.) However, the ALJ found that limitations in Virginia's RFC because of osteoarthritis would accommodate a torn meniscus in the same knee. (Id.); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (when assessing an RFC, the ALJ considers the "*aggregate* effect of the entire constellation of ailments," both severe and non-severe) (emphasis in original). Because the ALJ considered Virginia's osteoarthritis, knee pain, and torn meniscus in assessing the RFC, (A.R. 18-28), "no error could result solely from [the ALJ's] failure to label [the meniscus] impairment as severe," *Cotie v. Colvin*, No. 14 CV 7314, 2016 WL 5415045, at *10 (N.D. Ill. Sept. 28, 2016) (internal quotation and citation omitted). Accordingly, the court affirms the ALJ's step two analysis.

## B. RFC Assessment

Virginia argues that when assessing her RFC the ALJ should have accorded more weight to the opinion of her treating physician, Dr. Steen. Under the treating physician rule, an ALJ must give controlling weight to a treating physician's opinion if it is: "(1) supported by medical findings; and (2) consistent with substantial evidence in the record."[3] *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). If the ALJ concludes that a treating physician's opinion is not entitled to controlling weight,

---

[3] The Commissioner adopted new rules for agency review of disability claims involving the treating physician rule. *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017). But because these new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable here. (Id.)

he must give "good reasons" for discounting the opinion, after considering the following factors:

> (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty.

*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see also* 20 C.F.R. § 404.1527(c). So long as the ALJ articulates his reasons, he "may discount a treating physician's medical opinion if it is inconsistent" with the opinion of a consulting physician. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Dr. Steen opined that Virginia could lift and carry 11 to 20 pounds occasionally, but no more than 5 pounds frequently, stand or walk less than an hour in an eight-hour day, and sit less than four hours in an eight-hour day. Dr. Steen also opined that Virginia should elevate her legs at a 30- to 45-degree angle two to three times per day for one to two hours and avoid temperature extremes and high humidity. (A.R. 1027-29.) Dr. Steen concluded that Virginia satisfies Listing 4.02 and explained that:

> Virginia has changed modifiable risk factors but still continues to have chest pain requiring nitro every other day. She is still limited in activities due to the chest pain and physical limitations from the left hip arthritis pain. She is medically maximized and still continues to have chest pain.

(Id. at 1028.) The ALJ assigned "little weight" to Dr. Steen's opinion. (Id. at 29.) In assessing Virginia's RFC, the ALJ included certain postural and environmental limitations consistent with Dr. Steen's opinion. For example, the RFC assessment

limits Virginia's exposure to extreme cold and extreme heat.  (Id. at 17.)  The ALJ's assessment also limits Virginia to sedentary work.  (Id.)

In determining the amount of weight to give Dr. Steen's opinion, the ALJ considered factors set forth in 20 C.F.R. § 404.1527(c).  The ALJ acknowledged that Dr. Steen was a treating cardiac specialist.  (A.R. 29.)  But then the ALJ noted that Dr. Steen examined Virginia "only a few times prior to providing his opinion."  (Id.) Virginia disputes the number of times Dr. Steen saw her, citing six dates from February 3, 2014, through the date of Dr. Steen's opinion, February 3, 2016.  (R. 18, Pl.'s Mem. at 17.)  The government responds that only three of those records reflect actual visits during which Dr. Steen examined Virginia.  (R. 26, Govt.'s Resp. at 5 (citing R. 18, Pl.'s Mem. at 17; A.R. 674-80 (catheterization report), 683 (same), 1252 (Nov. 4, 2015 progress notes)).)  Regardless, the number of examinations by Dr. Steen reflected in the medical record is limited.  (Id.); *see also* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by the treating source, the more weight we will give to the treating source's medical opinion.").

Next the ALJ addressed inconsistencies between Dr. Steen's opinion and the medical evidence.  (A.R. 29.)  The ALJ pointed out that neither the record nor Dr. Steen's notes support limitations in his opinion.  *See* 20 C.F.R. § 404.1527(c)(3)- (4).  For example, Dr. Steen opined that Virginia's legs needed to be elevated during the day.  (A.R. 1027.)  Yet Dr. Steen's notes and other evidence of record do not support such a limitation.  (Id. at 19, 21, 24, 28-29 (noting no record of edema or an

order to elevate the legs); *see also id.* at 324, 352, 355, 446, 492, 508, 540, 566, 575, 581, 807, 850, 938, 1130, 1162, 1308, 1314, 1346 (reporting no edema, swelling, or need to elevate legs).) Furthermore, Virginia did not cite objective evidence supporting her need to elevate her legs. (R. 18, Pl.'s Mem. at 11, 15-17; R. 27, Pl.'s Reply at 3-6); *see also Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) (declining to find reversible error where the ALJ determined that no objective medical evidence supported a medical source's allegation that a claimant must elevate his leg at work); 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

The ALJ also found Dr. Steen's opinion that Virginia could only sit for less than four hours in an eight-hour day to lack support. (A.R. 29.) Dr. Steen noted that Virginia "continues to have chest pain requiring nitro every day" as of February 3, 2016. (Id. at 1028.) But this and other progress notes from Dr. Steen do not suggest a limited ability to sit. (Id. at 260, 283.) Moreover, Virginia "concede[d] she c[ould] sit without difficulty." (Id. at 29.) In the function reports submitted to the Commissioner on December 11, 2014, and June 12, 2015, Virginia indicated that her illnesses, injuries, or conditions did not affect her ability to sit. (Id. at 260, 283.)

Finally, the ALJ found that Dr. Steen's opinion that Virginia met Listing 4.02 was unsupported. (Id. at 29, 1027-29.) Treatment notes did not show that the listing requirements had been satisfied. (Id. at 29.) Additionally, the narrative that Dr. Steen provided on the "conclusory check box" form did not relate to Listing 4.02. (Id.) The ALJ thus was unsure whether Dr. Steen was "familiar with the listing

requirements." (Id.) Here Virginia does not even challenge the ALJ's finding that she did not meet or equal a listed impairment. Substantial evidence therefore supports the ALJ's decision to discount Dr. Steen's opinion to the extent that it was not consistent with the record. *See McFadden v. Berryhill*, 721 Fed. Appx. 501, 505 (7th Cir. 2018); *Hall v. Berryhill*, __ Fed. Appx. __, 2018 WL 4959710, at *3 (7th Cir. Oct. 15, 2018).

Conversely, Virginia argues that the ALJ accorded too much weight to state agency physicians, Drs. Victoria Dow and Vidya Madala. (R. 18, Pl.'s Mem. at 18-20.) With respect to their RFC opinions, the ALJ gave some weight to Dr. Dow because she did not review later-submitted records and her postural limitation was not supported, and greater weight to Dr. Madala because she had access to some of the later-submitted evidence. (Id. at 29-30.) The ALJ gave their opinions partial weight after February 1, 2014, because the later-received evidence showed limitation at the sedentary level. (Id. at 30.)

Virginia claims that the state agency medical opinions merited little weight because the physicians never examined Virginia, did not review all relevant evidence, and did not hold board certifications. (R. 18, Pl.'s Mem. at 18-19.) Under 20 C.F.R. § 404.1527(e)(2)(i), an ALJ "*must* consider findings and other opinions of State agency medical and psychological consultants," *id.* (emphasis in original), and may assign more weight to such physicians than to treating sources in certain situations, SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). Thus, even though the state agency physicians did not examine Virginia, the ALJ appropriately relied upon "the opinions

of physicians . . . who are also experts in social security disability evaluation." *See Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). While the state agency physicians did not review all relevant evidence, the ALJ noted that fact and limited the weight he afforded to them accordingly. (A.R. 29-30.) The court finds no reversible error in the ALJ's evaluation of the opinions of Drs. Dow or Madala.

Virginia further contends that the ALJ improperly highlighted normal findings while ignoring contrary findings. (R. 18, Pl.'s Mem. at 17.) She points to records that she alleges the ALJ purposefully omitted: "the abnormal myocardial perfusion study, the abnormal EKG showing sinus bradycardia, the cardiac catheterization demonstrating native [CAD,] and the angiography which showed severe atherosclerosis." (Id.) But an ALJ is not required to discuss every piece of evidence in the record in detail. *See Pepper*, 712 F.3d at 362. Even so, the ALJ here expressly referred to Virginia's October 20, 2014 cardiac catheterization confirming CAD. (A.R. 24.) A review of the ALJ's 19-page opinion reveals multiple references to Virginia's "long history of cardiac . . . impairments," (id. at 30), including CAD, history of CHF, bypass surgeries, catheterization procedures, angina, shortness of breath, jaw pain, CCS classifications, left atrial enlargement, left ventricular hypertrophy, and other cardiac issues, (id. at 21-24, 28-29). Indeed, in part because of Virginia's cardiac issues, the ALJ limited Virginia's RFC to sedentary work beginning in February 2014. (Id. at 23-24.) The court therefore finds that the ALJ adequately reviewed the record and directly addressed Virginia's evidence.

Virginia also asserts that the ALJ improperly played doctor when he found her sleep apnea and meniscus tear to be non-severe, rejected Dr. Steen's opinion that Virginia's legs needed to be elevated, and noted that no medical records suggested that Virginia's bypass surgery or recovery that occurred after the hearing would be "eventful or delayed." (R. 18, Pl.'s Mem. at 19-20.) As explained above, the ALJ did not commit reversible error in assessing the sufficiency of evidence relating to Virginia's sleep apnea and meniscus tear or in evaluating Dr. Steen's medical opinion. The same is true regarding the ALJ's assessment of the medical evidence relating to Virginia's 2016 bypass surgery and recovery. The ALJ noted that in August 2016 Virginia "had severe disease in three vessels, 90 percent LAD, 100 percent circumflex, and 70 percent RCA," thereby "necessitating surgery." (A.R. 29-30.) Virginia underwent bypass surgery on September 19, 2016, (id. at 1455-56), and by October 12, 2016, Dr. Steen reclassified Virginia as CCS I with "stable" CAD, (id. at 1421). The ALJ did not play doctor here but rather assessed the sufficiency of the medical evidence, and in doing so executed the very task assigned to him. *See* 20 C.F.R. §§ 404.1545, 404.1546(c), 404.1527(d)(2).

## C. Symptom Evaluation

Virginia also asserts that the ALJ improperly evaluated her symptoms by relying upon her ability to perform limited activities, discounting her complaints of fatigue, and mischaracterizing her testimony. (R. 18, Pl.'s Mem. at 21-22.) An ALJ's symptom evaluation is entitled to great deference and a reviewing court may only reverse such an assessment where it is "patently wrong." *See Stepp v. Colvin*, 795

F.3d 711, 720 (7th Cir. 2015). That is because as a witness to the claimant's testimony, the ALJ is in the best position to evaluate the believability of the claimant's symptom descriptions. *Id.* An "ALJ's credibility findings need not specify which statements were not credible," and if the evaluation is adequate the court will affirm even when it "also contains a considerable amount of boilerplate language and recitations." *Shideler*, 688 F.3d at 312. In short, a reviewing court will only disturb an ALJ's evaluation of a claimant's symptom description if it "is unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Virginia argues that the ALJ improperly relied upon her ability to perform activities in discrediting her symptom complaints. (A.R. 20-21.) An ALJ is required to consider the factors under 20 C.F.R. § 404.1529, including the claimant's daily activities, and need not "engage in a factor-by-factor analysis." *See Lekousis v. Colvin*, No. 13 CV 3773, 2015 WL 3856543, at *4 (N.D. Ill. June 19, 2015). The Seventh Circuit has cautioned against over-emphasizing these activities or equating them to full-time work. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Here the ALJ considered Virginia's reported activities and determined that they conflicted with her subjective allegations. *See* 20 C.F.R. 404.1529(c)(4); SSR 16-3p, 2016 WL 1119029, *8 (March 16, 2016). The ALJ explained:

> Despite allegations of significant limitation in her activities of daily living, the record confirms that notwithstanding her impairments the claimant was independent in her activities or only somewhat limited. Apparently her family paid a care giver to assist the claimant a few times a week but it is not clear why as the record confirms the claimant was able to exercise for long periods of time. The claimant does have angina but until recently the pain was described as infrequent and was not present for months at a time. Even then, it was precipitated by

activities such as stair climbing, not sitting, standing or walking, which the claimant reported she was able to do without limitation.

(A.R. 29.)  The ALJ also noted other inconsistencies that undermined Virginia's allegations, including her ability to shop and engage in "bike riding, use of the treadmill and water aerobics" and a June 27, 2016 report stating that she had "no problem with adult daily living activities." (Id. at 27, 1225, 1345.) The ALJ further observed that Virginia responded "cogently and appropriately" during the 75-minute hearing. (Id. at 29.)  The court finds that the ALJ reasonably explained why Virginia's daily activities were inconsistent with her specific symptom allegations.

Virginia next contends that the ALJ unfairly discounted her subjective complaints of fatigue. (R. 18, Pl.'s Mem. at 21.) She points to cardiac issues, sleep apnea, and the fact that she took up to 18 medications a day for support for her need to nap. (Id.) But the ALJ found no basis to credit Virginia's testimony that she needs to nap several times a day. (A.R. 29, 72.) The ALJ explained that "[s]he did not mention this limitation to her treating physician and she explicitly denied any side effects from medication when asked by a doctor." (Id. at 29; see also id. at 19-20, 23, 24, 28.) In her July 2016 statement to the Commissioner listing her medications, Virginia nowhere alleged fatigue or drowsiness as a side effect. (Id. at 310.) Thus, the ALJ provided specific reasons supported by the record to find Virginia's alleged symptoms inconsistent with the evidence. *See Hall*, 2018 WL 4959710, at *4.

Finally, Virginia claims that the ALJ mischaracterized her testimony. (R. 18, Pl.'s Mem. at 21-22.) Virginia disputes the alleged "independent" nature of her ability to perform daily activities. (Id. at 21.) But the ALJ quoted "independent" from the

medical record in referring to Virginia's previous level of functioning before a 2015 fall. (Id. at 27, 1225; see also id. at 1345.) Virginia asserts that her family had to hire an aide to assist her with daily activities such as dressing, hygiene, and meal preparation. (R. 18, Pl.'s Mem. at 21.) The ALJ considered Virginia's testimony and a statement from the care giver, who is Virginia's cousin. (A.R. 30, 62, 1283.) The ALJ found "no objective evidence" indicating that a care giver was necessary. (Id. at 30.) To the contrary, Virginia's ability to swim up to one hour, (id. at 353, 543), and walk without limitations, (id. at 331, 470, 543), undermined her allegations, according to the ALJ. Accordingly, the ALJ's symptom evaluation was reasonable and supported by substantial evidence. *See Getch*, 539 F.3d at 483.

## D. VE's Testimony

Virginia argues that the ALJ lacked substantial evidence to determine that she could perform her past relevant work. (R. 18, Pl.'s Mem. at 22-25.) She contends that the ALJ relied upon a faulty RFC and that the ALJ failed to include in the hypothetical question all limitations in the RFC. (Id. at 22-24.) The court disagrees. The hypothetical questions posed to the VE included the limitations that the ALJ deemed credible. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) ("[T]he ALJ is required only to incorporate into [her] hypotheticals those impairments and limitations that [she] accepts as credible.") (internal quotation and citation omitted). The first two hypothetical questions posed to the VE included the limitations set forth in the RFC finding from the onset date through January 31, 2014. (R. 26, Govt.'s Resp. at 14 (citing A.R. 17, 83-84).) In the third hypothetical, the ALJ asked if "that

person" in the prior hypotheticals were limited to sedentary work whether the outcome would change. (A.R. 84-85.) The question incorporated the limitations from the prior hypothetical, consistent with the RFC finding for the period after February 1, 2014.

Virginia further complains that the ALJ "rejected" the VE's testimony regarding the impact of more severe limitations on the availability of jobs. (R. 18, Pl.'s Mem. at 24.) Here the ALJ found that Virginia did not experience more severe limitations and did not include them in the RFC. (R. 26, Govt.'s Resp. at 14.) As a result, the ALJ was not required to consider how those more severe limitations affected the availability of jobs. The court finds no reason to remand on this issue.

## Conclusion

For the foregoing reasons, Virginia's motion for summary judgment is denied, the government's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

_Young B. L_

**Young B. Kim**
**United States Magistrate Judge**